BOARD OF DIRECTORS OF MAINE
SCHOOL ADMINISTRATIVE
DISTRICT NO. 33

v.

TEACHERS ASSOCIATION OF MAINE
SCHOOL ADMINISTRATIVE
DISTRICT NO. 33.

Supreme Judicial Court of Maine.

Oct. 27, 1978.

Drummond, Woodsum, Plimpton & MacMahon, P.A. by Hugh G. E. MacMahon (orally), Harry R. Pringle, Portland, for plaintiff.

Sunenblick, Fontaine & Reben by Stephen P. Sunenblick (orally), Donald F. Fontaine, Portland, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, DELAHANTY, GODFREY and NICHOLS, JJ.

WERNICK, Justice.

This is an appeal by the Teachers Association of Maine School Administrative District No. 33 (the Association) from a judgment of the Superior Court (Aroostook County) entered October 6, 1977, which, pursuant to 14 M.R.S.A. § 5938.1.C (Supp. 1978), vacated an arbitration award on the ground that the arbitrator exceeded his powers.

Judy Paradis was employed in the Maine School Administrative District No. 33 (M.S. A.D. No. 33), St. Agatha, public school system as a teacher with a continuing contract

(as distinguished from a teacher having a probationary contract). See 20 M.R.S.A. § 161(5) (Supp.1965 to 1978). In May, 1976, she received a letter from the Superintendent of Schools which stated:

"On May 7, 1976, at a regular meeting, the School Directors, acting upon my recommendation, voted to eliminate the teaching position you hold in M.S.A.D. No. 33.

"I regret to inform you that, consistent with the action of the School Directors, you are hereby notified that the teaching position you now hold in M.S.A.D. No. 33 is eliminated, effective with the close of the 1975–1976 school year. And that, your teaching contract with M.S.A.D. No. 33 will be terminated 90 days after the date of this notice, as provided in subsection 161, paragraph 5 of Title 20 of the Maine Revised Statutes."

Commencing May 14, 1976 the Association instituted procedures on behalf of Judy Paradis which purported to be "grievance" procedures under the collective bargaining agreement between the Association and the Board of Directors of M.S.A.D. No. 33 (School Board). When no resolution of the issue resulted, the Association invoked arbitration as the ultimate process under the collective bargaining agreement to achieve a final and binding resolution of a "grievance."

A single arbitrator heard the matter, and he made an arbitration award on December 28, 1976. The School Board then filed in the Superior Court an "Application to Vacate the Arbitration Award" and the award was vacated.

By their collective bargaining agreement the parties placed the following limitations on the scope of "grievance arbitration": (1) the subject-matter which may constitute a "grievance" is

"any alleged violation of this Agreement or any dispute with respect to its meaning or application" (Article IV–B 1 of the Agreement);

and (2)

"[t]he arbitrator will be without power or authority to make any decision which re-

quires the commission of an act prohibited by law or which is violative of the terms of this Agreement. . . . The arbitrator shall have no power to alter, add to or detract from the provisions of the Agreement." (Article IV–E 2 of the Agreement)

Throughout the proceedings before and during arbitration Article V–C of the collective bargaining agreement was the focus of the controversy. It reads:

"Whenever it becomes the intention of the administration of M.S.A.D. No. 33 to recommend to the Board the elimination of a teaching position, the administration will notify the teacher and the Association, in that order, of the intent and will meet with representatives of the Association to discuss the elimination of such position prior to final action being taken by the Board.

"Whenever teaching positions are eliminated in M.S.A.D. No. 33 it will be the policy of the administration to retain those teachers who by training, seniority and experience are most capable of meeting student needs in both the short and long run. Emphasis will be placed on maintaining a balanced staff."

The Association maintained that Judy Paradis had a "grievance" under Article V–C, as constituted by her claim that the "training, seniority and experience" factors therein specified regarding the "retain[ing] . . [of] teachers" were violated when, choosing between her and another teacher having only a probationary contract and less seniority, the School Board terminated Judy Paradis and retained the other teacher.

The arbitrator sustained the Association's claim, finding that the Board had violated the "training, seniority and experience" factors stated in Article V–C in terminating Judy Paradis and retaining the probationary teacher having less seniority. He ordered that Judy Paradis be

"reinstated with full benefits and rights and made whole retroactive to the date of her termination"

as well as that

"[h]er file . . . be expunged of all materials related to this termination."

We deny the Association's appeal from the judgment of the Superior Court, holding that that Court acted correctly in vacating the arbitrator's award.

■ We decide that the collective bargaining agreement failed to make the matters here in controversy a "grievance" subject to the arbitration process for final and binding resolution. By adjudicating the merits of the dispute, therefore, the arbitrator acted beyond the powers conferred by the collective bargaining agreement, and it was proper that his award be vacated pursuant to 14 M.R.S.A. § 5938.1.C (Supp.1978). *Superintending School Committee of the City of Portland v. Portland Teachers' Association,* Me., 338 A.2d 155 (1975).

The most salient feature of Article V–C, which is the textual language here determinative of arbitrability, is that its first sentence makes plain that "the administration" of M.S.A.D. No. 33 is a part of the governing hierarchy of the District separate and distinct, as an entity and in function, from the Board of Directors. To establish this point we again quote the language of the first sentence, adding emphasis to assist in the analysis:

"Whenever it becomes the intention of *the administration* of M.S.A.D. No. 33 to *recommend* to *the Board* the elimination of a teaching position, *the administration* will notify the teacher and the Association, in that order, of the intent and will meet with representatives of the Association to discuss the elimination of such position prior to *final action* being taken by *the Board.*"

The words emphasized show expressly, and unmistakably, that "the administration" is regarded as separate from the "Board of Directors" and also, as to the matters here under consideration, has a distinctly different function. It is "the administration" which "meet[s] with representatives of the

Association" and then *recommends* to the Board of Directors. Thereafter, it is the Board of Directors which alone takes the *final* action.

Examination of the entirety of the collective bargaining agreement reveals that this conception of "the administration" as separate and distinct from the Board of Directors is the deliberate design of the collective bargaining agreement, not merely a linguistic fortuity in Article V–C. Where relevant, the same separation consistently appears in the provisions of the agreement.

Most significant and enlightening in this regard is Article XI. It bears the title, "Teacher-*Administration* Liaison", (emphasis supplied) and provides as follows:

"A. The Association shall select a Liaison Committee for each school building which shall meet with the *Principal* within a reasonable time following a request to meet, normally not more than once per month, to review and discuss local school problems and practices, and to play an active role in the revision or development of building policies.

"B. The Association's representative shall meet with the *Superintendent* within a reasonable time following a request to meet, normally not more than once per month, to review and discuss current school problems and practices." (emphasis supplied)

The language emphasized strongly indicates that the collective bargaining agreement identifies "the Administration" as consisting of those persons who act at levels below the top echelon of the Board of Directors, like "Principals" or the "Superintendent" (or assistant principals, department heads or Assistant Superintendents), and who, because they have supervisory responsibilities and exercise supervisory powers, are excluded from the collective bargaining unit by Article I–C of the agreement.[1]

---

1. Other Articles in the agreement which confirm this separation between "the Administration" and the "Board of Directors" are the following,

Article VI–H says:
"The *Administration* shall provide an annual pool of five (5) non-cumulative days from which the Association officers or their repre-

By thus establishing that "the Administration" has existence and functions separate and distinct from the "Board of Directors" the collective bargaining makes abundantly clear that Article V–C fails to authorize as a "grievance", subject to final and binding arbitration, the ultimate action taken by the Board of Directors eliminating "a teaching position", thus to eliminate the teacher who occupies that "position." With "the administration" recognized as separate and distinct from the "Board of Directors", Article V–C must be taken as providing no more than that it will be the "policy" of *the administration* in formulating a *recommendation* to the Board of Directors to consider the "training, seniority and experience" of the teachers who could be affected (depending on which teaching position is selected for elimination), and also to take into account the necessities of "maintaining a balanced staff" and the capability of the teachers involved to meet "student needs in both the short and long run." Such expression of a "policy" for the guidance of lower-level personnel who have only an intermediate authority to make a "recommendation"

to the Board of Directors, which alone has the power of decision, cannot reasonably be construed as a contractual prescription of a standard governing the Board's decision.

Fortifying this conclusion is the further provision in Article V–C that the decision of the Board of Directors is *"final* action." (emphasis supplied) Here, "final" fairly imports not merely that the Board's decision is the action of last resort within the hierarchy responsible to govern M.S.A.D. No. 33 but further that it is the *ultimately definitive* action and, therefore, not subject to review by the external process of "grievance" arbitration.

Thus, the textual language of Article V–C, with complete internal harmony, establishes that no "grievance" arises by viɪ - tue of alleged deviation from, or misconception or misapplication of, the factors stated as "policy" to assist personnel acting at lower levels in formulating a recommendation to the Board of Directors for *its exclusive and ultimately determinative* action.

■ It was therefore beyond the power of the arbitrator to decide the merits of the controversy here involved.[2]

sentatives may draw from, until expended, for Association business at the county or state levels. These days shall total five (5) days for the Association and not per officer. Whenever possible, the Association agrees to give forty-eight (48) hours advance notice to the *Superintendent's office* for all such days used and shall bear the cost of all such substitutes used on such days." (emphasis supplied)

Article IX–D provides:

"The Association recognizes the authority and responsibility of the *Principal* for disciplining or reprimanding a teacher for delinquency of professional performance. If a teacher is to be disciplined or reprimanded by a member of the *administration above the level of this person,* however, he may, at his request, have a representative of the Association present." (emphasis supplied)

2. The instant collective bargaining agreement does not purport in express, direct and unequivocal language to confer upon the arbitrator the *exclusive* power *to make a final and* binding determination of an issue of substantive arbitrability or otherwise to seek to preclude judicial consideration of such a question. Hence, we do not hesitate to decide, here, that the issue of substantive arbitrability remained

open for determination in the last analysis by a court.

By mentioning this point we intimate nothing as to our position were the collective bargaining agreement to contain express language making unmistakably plain that the parties sought to exclude a judicial consideration of the question of substantive arbitrability. Although such a provision may be given effect in the private sector, see *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 583 n. 7, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), a different approach may be required in the public sector where statutory prescriptions of public policy frequently, and substantially, limit or affect the scope of collective bargaining. For this reason, not only "interest" but also "grievance" arbitration, if contemplated as final and binding, may in many contexts be "institutionally incompetent to effectuate the requirements of statutory law . . . ." See *Lewiston Firefighters Association, Local 785, International Association of Firefighters, AFL-CIO, et al. v. City of Lewiston, et al.,* Me., 354 A.2d 154, 167 (1976), and therefore, despite *contractual provisions expressly and plainly* purporting to exclude a court determination of an issue of substantive arbitrability, sound public policy may demand that an arbitrator's determination of such question remain subject to judicial review.

 

The entry is:

Appeal denied; the judgment vacating the award of the arbitrator is affirmed.

ARCHIBALD, J., did not sit.